## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| _____ : | | |
| **IN RE:** : | | **CHAPTER 11** |
| : | | |
| **FOREST PARK MEDICAL CENTER** : | | |
| **AT FRISCO, LLC,** : | | **CASE NO.** 15-41684 **- BTR** |
| : | | |
| **DEBTOR.** : | | |
| : | | |
| _____ : | | |

## AFFIDAVIT OF MICHAEL MILLER
## IN SUPPORT OF THE DEBTOR'S CHAPTER 11
## PETITION AND REQUESTS FOR FIRST-DAY RELIEF

Michael Miller hereby declares, under penalty of perjury, as follows:

1.      I am the Chief Restructuring Officer of Forest Park Medical Center at Frisco, LLC ("FPMC"), Chapter 11 debtor and debtor-in-possession (the "Debtor"), and based upon my involvement with the Debtor as Chief Restructuring Advisor effective September 11, 2015, and in my role as the Debtor's Chief Restructuring Officer as of September 17, 2015, I am familiar with the day-to-day operations, business, and financial affairs of the Debtor. I set forth the following in support of the Debtor's Chapter 11 petition and requests for relief filed contemporaneously herewith.

## I.
## INTRODUCTION

2.      I was appointed as Chief Restructuring Advisor ("CRA") for the Debtor effective September 11, 2015.  The Debtor's Interim Restructuring Officer, vested with the power to appoint me as the Debtor's Chief Restructuring Officer ("CRO"), did so on September 17, 2015. The Debtor is a Texas limited liability company that owns and operates a 54-bed state-of-the-art

**AFFIDAVIT OF MICHAEL MILLER**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 1**

4836-6125-9816.1

medical facility, including 30 private rooms, 14 family suites, and 10 intensive care rooms (the "Hospital") in Frisco, Texas.

3.      I have more than 30 years of experience in healthcare administration and finance through various hospital administrative and executive roles.  I hold a Bachelor of Science from University of Texas at Arlington, and a Master of Business Administration from the University of Dallas.  I have previously served as CEO, CFO, COO and CRO for a variety of hospitals, long term acute care hospitals, skilled nursing, rehabilitative units, psychiatric units, ambulatory care clinics and durable medical care.  I have extensive experience examining the finances and operations of hospitals, particularly in the distressed setting.

4.      On the date hereof (the "Petition Date"), the Debtor commenced its Chapter 11 case (the "Case") by filing a voluntary petition for relief under Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Eastern District of Texas.

5.      To minimize the adverse effects on the business as a result of the commencement of the Case, the Debtor requests, contemporaneously herewith, various types of relief in certain "First-Day" applications and motions (collectively, the "First-Day Motions") filed herewith.

6.      The First-Day Motions focus on: (a) obtaining approval for immediate debtor-in-possession financing necessary for the continued operation of the hospital and care of its patients; (b) approval of my appointment as independent chief restructuring officer in this proceeding; (c) allowing for the payment to FPMC Services, LLC ("Shared Services") of amounts needed to satisfy wages and benefits owed to the individuals working at the Hospital and in their business office providing services to the Debtor but employed and paid by Shared Services; (d) maintenance, on a limited basis, of pre-petition cash management systems needed

**AFFIDAVIT OF MICHAEL MILLER**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 2**

4836-6125-9816.1

to prevent disruption of critical payments from insurers; and (e) a motion to ensure proper patient privacy in connection with the various filings and disclosures required by the Bankruptcy Code and associated rules.

7.      Without access to the capital provided in the proposed debtor-in-possession financing, the Debtor will be unable to continue operations, including maintaining the required level of care for its patients.  Further, a chief restructuring officer is crucial to the Debtor's efforts in this case, providing highly specialized turnaround services to the Debtor's management.  In addition, payment for the employees who work inside the Hospital, while technically employees of Shared Services, is required to maintain operations.  Additionally, the Debtor seeks relief to continue the use of its current cash management system for a limited time and on a limited basis in order to avoid an interruption in the flow of revenues from insurance reimbursements and patient payments.  Finally, certain relief is needed to honor patient privacy while also filing the appropriate disclosures and providing notice to all applicable notice parties.

8.      In addition to the personal knowledge that I have acquired while working with the Debtor, I also have basic knowledge of, and familiarity with the Debtor's operational and financial affairs.  I have also participated in negotiations with the Debtor's secured lender, vendors, landlord, and others, and worked closely with the Debtor's personnel who handle business operations and financial management, as well as with the Debtor's outside counsel and other advisors. Except as otherwise indicated, all statements in this Affidavit are based upon my personal knowledge, my review of the Debtor's books and records, and other relevant documents, and other information prepared or collected by the Hospital's employees, or upon my opinion based upon my experience with the Debtor's operations and financial condition and of the Hospital. In making the statements herein, based upon the foregoing, I have relied in part

**AFFIDAVIT OF MICHAEL MILLER**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 3**

4836-6125-9816.1

upon others to accurately record, prepare, and collect any such documentation and other information.

9.      I submit this Affidavit in support of the Debtor's petitions and First-Day Motions. As the Chief Restructuring Officer of the Debtor, I am authorized to submit this Affidavit on behalf of the Debtor.

10.     If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge and review of documents, or upon my professional opinion.

11.     Part II of this Affidavit provides an executive summary of the Case and the Debtor's strategy. Part III of this Affidavit describes in more detail the Debtor's business, the developments which led to the Debtor's Chapter 11 filing, and our goals in this Case. Part IV sets forth facts relevant to consideration of the First-Day Motions.

## II.
## EXECUTIVE SUMMARY

12.     The Debtor is a Texas limited liability company set up by individuals who initially owned and controlled Vibrant Healthcare Frisco Holdings, LLC ("Managing Member): Dr. Wade Barker, Dr. Richard Toussaint, Mr. Mac Burt and Mr. Alan Beauchamp (the "Founders").  The Founders set up seven identical structures for hospitals in and near Texas, including Austin, Frisco, Southlake, Dallas, Fort Worth, San Antonio and Kansas City, Missouri. Each was set up with Debtor's structure: the Founders own membership interests in the Debtor that owns the hospital operations, as well as the Managing Member of the Debtor, and Vibrant Healthcare Frisco, LLC, the Debtor's management company ("Management Company").   In addition, the Founders set up Shared Services that provides all back office services, including employing all employees, and processing and tracking accounts payable and accounts receivable.

**AFFIDAVIT OF MICHAEL MILLER**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 4**

4836-6125-9816.1

Shared Services was initially run primarily by Wade Barker and Richard Toussaint. In April 2015, Todd Furniss replaced Richard Touissant.

13.    Pre-petition, the Debtor's cash receipts were deposited into one lockbox account at Texas Capital Bank ("TCB") in the Debtor's name, and then swept to a disbursement account from where all operating expenses save payroll expenses were paid. Payroll expenses were transferred from the disbursement account to a separate payroll account and then transferred to ADP for processing. The only signatories to these accounts are Todd Furniss and Mary Hatcher, both with glendonTodd Capital, LLC ("GlendonTodd")[1] and Lynn Gibson, employed by Shared Services. No one physically present at the Hospital has signatory authority over these operating accounts.

14.    Around December 2014, the Debtor learned that TCB, Debtor's current secured lender, sought to exit the healthcare financing line of business, and as such, would not be renewing the Debtor's $2.5M line of credit (the "Line of Credit") nor providing further extensions of credit past its maturity. On April 1, 2015, the Line of Credit matured without any options to replace this critical piece of managing the Debtor's operations. The only alternative financing ever presented contemplated a loan from Callidus Capital Corporation ("Callidus"), a Canadian company, paying off and replacing the Line of Credit with a maximum availability of $8 million, based upon the level of accounts receivable, at 5% interest and payable upon demand. However, this financing never provided any cash to the Debtor due to Callidus' objections to a pending vendor lawsuit, delay executing a new management agreement and the landlord's declaration of default due to approximately $7 million in unpaid rental obligations. The problems faced by the Debtor are detailed further in Part III of this Affidavit.

---

[1] Todd Furniss and Mary Hatcher are also with the Managing Member and Vibrant Healthcare Frisco, LLC.

**AFFIDAVIT OF MICHAEL MILLER**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 5**

15.     The Debtor's operations were developed based upon an "out-of-network" model. This model relied upon higher reimbursement rates as an exclusive out-of-network facility. However, the Debtor's declining 2013 revenues revealed that the out of network model did not provide a sufficient level of revenue to sustain operations.  Consequently, the Debtor attempted to increase its revenues by entering into network contracts with various insurance providers. Although being "in network" with various insurance providers would result in discounted reimbursement rates, it was believed that being in network would increase the volume of procedures at the Hospital and thus increase overall revenues.  However, the reduced rates the insurance providers contracted for did not increase volume enough, and available cash to purchase supplies dwindled, eventually causing a further reduction in the Debtor's revenues.

16.     Notably, based upon 2013 and 2014 performance, the Debtor anticipates a 25% increase in revenue as 2015 comes to a close due to patients seeking to exhaust their flexible spending accounts before January 1, 2016, and also due to patients having met their deductible under their insurance plans earlier in the year.  Unfortunately, this uptick in performance alone will not be enough to solve the Debtor's financial issues.

17.     In order to address the issues facing the Debtor's business, the Debtor undertook a series of activities designed to recapitalize the Debtor. Initially, the Debtor focused on seeking outside financing to pay off the Line of Credit and provide additional working capital. In the interim, the Debtor's landlord, Sabra Texas Holdings, L.P. ("Sabra"), offered to provide debtor-in-possession ("DIP") financing.  Thus, the First-Day Motions focus on approving this financing, preserving patient privacy and confidentiality, allowing payment of prepetition wages and benefits to the employees working at the Hospital, and appointing a CRO with a level of healthcare restructuring experience necessary to independently evaluate the Debtor's

**AFFIDAVIT OF MICHAEL MILLER**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 6**

4836-6125-9816.1

business and its restructuring opportunities and allow the doctors serving as the board of managers to focus on what makes this Debtor what it is: providing top-notch quality health care services to its patients.

A.    OVERVIEW OF THE DEBTOR

 Forest Park Medical Center at Frisco

18.    The Hospital, located at 5500 Frisco Square Boulevard in Frisco, Texas, off of the Dallas North Tollway and Main Street, pays close attention to details necessary to a luxury medical care facility, such as a lobby water feature, soothing scents in the HVAC system, meals cooked to order by an on-site chef, green views from every room, calming colors and low lighting to increase relaxation, and softened textures.  It is currently minimally staffed for an average daily census of 1-3 inpatients per day and up to 200 outpatients per month, but has a fully staffed maximum capacity of 54 inpatients per day and 1,000 outpatients per month. The Debtor's leased facility is comprised of over 136,759 useable square feet and is situated on approximately 4.7 acres. The Debtor has approximately 159 employees.

19.    The Debtor offers a range of surgical services, including, but not limited to, pediatric, bariatric, brain, orthopedic, pain management, plastics and reconstructive, spine, and neurosurgery.

20.    The Debtor is owned by 86 doctors, each owning different numbers of membership units in one of four classes.

21.    The Debtor's Hospital is managed by the Management Company by and through that certain *Hospital Development and Management Services Agreement* as thereafter amended and supplemented (the "Management Agreement").  The Management Agreement provides for the Hospital's management, including, but not limited to, personnel administration, accounting

**AFFIDAVIT OF MICHAEL MILLER
IN SUPPORT OF THE DEBTOR'S CHAPTER 11
PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 7**

4836-6125-9816.1

and financial matters, medical record management and maintenance, quality assurance program design, and implementation of periodic reporting and management support services. In exchange for these services, the Management Company receives 3% of all the Debtor's net revenues.

22.    Under the Management Agreement, Shared Services employs all of the employees working at the Hospital and is responsible for training, preparing staffing schedules, creating job and position descriptions, payment of payroll obligations, and, jointly with the Debtor, hire, fire, promote, discipline, and obtain benefits. Shared Services also charges the Debtor for the overhead expenses associated with providing services to the Debtor.

Forest Park Medical Centers

23.    The Forest Park Medical Centers are made up of seven limited liability companies organized and founded by the Founders each to own a hospital like the Debtor's Hospital in each of seven locations: Austin, Dallas, Southlake, Frisco, Fort Worth and San Antonio, Texas and Kansas City, Missouri. Kansas City has yet to start construction and Austin is not yet open for operation; each were formed by the Founders and set up operationally in a similar manner.

B.    FINANCING HISTORY

Pre-Petition Financing

24.    On or about October 10, 2012, the Debtor entered into that certain *Loan and Security Agreement,* dated as of October 10, 2012, by and between the Debtor and TCB, as such may have been amended and/or supplemented from time to time (the "Line of Credit Agreement").

25.    The Debtors currently owe approximately $2,500,000.00 under the Line of Credit Agreement, secured by essentially all of the Debtor's assets.

**AFFIDAVIT OF MICHAEL MILLER
IN SUPPORT OF THE DEBTOR'S CHAPTER 11
PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 8**

26.     The Debtor is also indebted to TCB pursuant to that certain *Master Equipment Lease* dated May 30, 2012 (the "Master Equipment Agreement") in connection with the financing of certain of the Debtor's equipment.  The remainder of the equipment is leased through various parties. The Debtor's total indebtedness to TCB as of the Petition Date is approximately $6,000,000.00, secured by the Debtor's assets.

27.     Currently, based upon a trailing three (3) months ending in July 2015, the Debtor generates approximately $3,400,000.00 a month in revenue, and has operational expenses of approximately $4,300,000.00 a month (not including restructuring costs and debt service obligations). As such, the Debtor does not generate sufficient revenue to operate the Hospital and to service its debt unless the number of patients exceeds recent levels.

Landlord and DIP Financing

28.     The Debtor leases the real property and fixtures on which the Hospital operates, from Sabra pursuant to the terms of that certain *Lease Agreement* dated December 6, 2010, which was thereafter amended pursuant to that certain *First Amendment to Lease Agreement* dated as of October 22, 2013, (the "Lease") assigning the Lease from FPMC Frisco Realty Partners, LP to Sabra.  The Lease is for an initial term of 20 years, accruing rent in the amount of $842,290.00 per month for the Hospital and the parking structure, to increase every calendar year over the term of the Lease by 3%.

29.     TCB has refused to provide the Debtor with DIP financing.  However, Sabra has offered the Debtor DIP financing in the approximate amount of $18,500,000.00 available in draws and accruing interest at a 5% interest rate, payable monthly in arrears ("DIP Financing").   The DIP Financing would mature upon the occurrence of certain events, including the conversion of this Case, dismissal of this Case, the sale of substantially all of the

**AFFIDAVIT OF MICHAEL MILLER**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 9**

4836-6125-9816.1

Debtor's assets, the revocation of the Debtor's license to operate or the expiration of 35 days after the filing of the Petition if a final order approving the DIP Financing has not been entered by the Bankruptcy Court.

30.     Prior to the Petition Date, the Debtor anticipated that without continuing liquidity, the value of its assets would rapidly diminish and would more than likely require the Debtor to close down the Hospital and liquidate its assets.

<u>Retention of Deloitte CRG</u>

31.     To address exigent financial and operational issues, the Debtor retained Deloitte CRG ("Deloitte") on September 11, 2015, Deloitte is retained to assist the Debtor to, among other things, create short-term budgets, negotiate appropriate waivers and forbearances, and assess the Debtor's available assets and options by which to improve the Debtor.

<u>The Debtor's Intentions in Chapter 11</u>

32.     In Chapter 11, the Debtor has an opportunity to quickly evaluate whether a plan of reorganization or a sale of the Debtor's assets will provide for the most recovery to the Debtor's creditors.  This case will avoid further deterioration of the Debtor's business, would preserve over one hundred jobs, and would achieve maximum values for all creditors.

33.     In order to evaluate the strategies set forth herein, and maximize values for all creditors, including unsecured creditors, the Debtor was forced to commence this Chapter 11 case now and respectfully seek the relief set forth in the First-Day Motions summarized below.

### III.
### FIRST-DAY MOTIONS

34.     Concurrently with the filing of this Chapter 11 Case, the Debtor has filed a number of First-Day Motions. The Debtor anticipates that the Court will conduct a hearing within a business day or two after the commencement of the Case (the "First-Day Hearing"),

**AFFIDAVIT OF MICHAEL MILLER**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 10**

4836-6125-9816.1

during which the Court will entertain the argument of counsel with respect to the relief sought in the First-Day Motions.

35.     Generally, the First-Day Motions have been designed to meet the immediate goals of: (a) maintaining adequate patient care; (b) continuing the Debtor's operations during the Case with as little disruption and loss of productivity as possible; (c) maintaining patient privacy and confidentiality, and (d) appointing a chief restructuring officer to manage the Debtor through this bankruptcy process.

36.     I have reviewed each of the First-Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First-Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve success in the Chapter 11 Case.

37.     The First-Day Motions are identified and more fully described below.

A.     DEBTOR'S APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE EMPLOYMENT, RETENTION AND DESIGNATION OF MICHAEL S. MILLER AS CHIEF RESTRUCTURING OFFICER

38.     The Debtor's voting Board of Managers is made up of six (6) practicing doctor owners and two representatives from GlendonTodd representing the Managing Member.  All of these members whether directly or indirectly, hold claims against the Debtor, whether as equity holders or as creditors.  As such, those parties have, at minimum, conflicts with the Debtor.

39.     I seek to serve as the CRO for the Debtor to guide them through the bankruptcy and restructuring process to provide an experienced, independent perspective to the Debtor and its financial and operational needs.  In this capacity, I plan to assess the Debtor's needs holistically, with no agenda but rehabilitation.  I can independently request and review information, evaluate the same, and diagnose any problems from which the Debtor suffers.  I can

**AFFIDAVIT OF MICHAEL MILLER**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 11**

4836-6125-9816.1

then use that information to work with counsel and other professionals, including the doctors that

operate in this hospital, to return it to its intended purpose: a high quality care facility.

40.     To the best of my knowledge and except to the extent disclosed herein: (a) I

have no connection with the Debtor, its creditors, or other parties in interest, or the

attorneys or accountants of the foregoing, or the Office of the United States Trustee for

the Eastern District of Texas (the "U.S. Trustee") or any person employed in the Office of

the U.S. Trustee; and (b) I do not hold any interest adverse to the Debtor's estate.

41.     Additionally, TCB and the Debtor's proposed post-petition lender, Sabra, has

specifically required that I be appointed CRO of the Debtor as a term of the DIP Financing

Agreement.

**B.     DEBTOR'S EMERGENCY MOTION PURSUANT TO SECTIONS 105(a), 345(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO (I) CONTINUE LIMITED USE OF EXISTING CASH MANAGEMENT SYSTEM AND (II) MAINTAIN EXISTING BANK ACCOUNTS AND (III) WAIVE CERTAIN DEPOSIT GUIDELINES**

42.     To efficiently and seamlessly manage its business, Shared Services, on behalf of

the Debtor, utilizes a cash management system (the "Cash Management System") to collect and

transfer the funds generated from the collection of accounts receivable of the Debtor at the

Hospital, depositing the collections in one bank account and transferring funds to a disbursing

account from which its financial obligations are paid.  The Cash Management System facilitates

the Debtor's cash monitoring, forecasting and reporting, and enables the Debtor, through Shared

Services, to maintain control over the administration of its bank accounts.  A list of the Debtor's

TCB Accounts (hereafter defined) is attached hereto as Exhibit A.[2]

---

[2] Complete account numbers have been redacted due to confidentiality concerns, leaving only the last four digits for reference.

**AFFIDAVIT OF MICHAEL MILLER
IN SUPPORT OF THE DEBTOR'S CHAPTER 11
PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 12**

43.     Specifically, pre-petition, the Debtor's receipts, including but not limited to electronic funds transfers from insurance companies, credit card companies, and direct patient payments, were deposited into one lockbox account at TCB in the Debtor's name (the "Lockbox Account"), and then swept to a disbursement account also at TCB from where all operating expenses save payroll expenses were paid (the "Disbursement Account").  Payroll expenses were transferred from the disbursement account to a separate payroll account held at TCB (the "Payroll Account") (together with the Lockbox Account and the Disbursement Account, the "TCB Accounts") and then transferred to ADP for processing.  On or about Friday, September 11, 2015, TCB froze the TCB Accounts and is requiring the Debtor to seek permission for any expenses to be paid from the TCB Accounts.

44.     The Debtor is seeking authority to (i) continue to operate the Cash Management System to a limited extent, (ii) maintain certain of the Debtor's existing Bank Accounts and (iii) a waiver of Section 345(b) of the Bankruptcy Code as necessary.

45.     In order to avoid disruption to the Debtor's business and or the flow of incoming cash, the Debtor proposes to maintain its existing Lockbox Account for collections on pre-petition accounts receivables and to also open new debtor in possession accounts at PlainsCapital Bank, an authorized depository institution for DIP financing funds and proceeds thereof. The Debtor proposes that collections from Pre-Petition Receivables should continue to flow into the Lockbox Account consistent with pre-petition practices to avoid any delay in receipt of payments due to confusion for a period of fourteen (14) days.  The Debtor proposes to open a new debtor in possession receipts account (the "DIP Receipts Account"), disbursement account (the "DIP Disbursements Account"), and payroll account (the "DIP Payroll Account") (collectively, the "DIP Accounts") at PlainsCapital Bank, an authorized institution, for the

**AFFIDAVIT OF MICHAEL MILLER**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 13**

4836-6125-9816.1

deposit of post-petition receivables.  In the event post-petition receivables are deposited in the Lockbox Account, the Debtor will transfer those funds from the Lockbox Account to the DIP Receipts Account.  The Debtor will make all post-petition ordinary course of business payments from the DIP Account, except for payments to ADP for payroll obligations attributable to the employees needed to operate the Hospital.  The Debtor will also keep track of collections on pre-petition receivables and post-petition receivables to maintain the collateral rights of TCB and the Debtor's post-petition lender.

46.     The Cash Management System constitutes an ordinary course and essential business practice providing significant benefits to the Debtor, including, among other things, the ability to ensure the maximum availability of funds when and where necessary, and to reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.

47.     As a practical matter, many of the Debtor's customers transfer their payments directly to the Lockbox Account, and being insurance companies, changing that information can be time consuming and difficult, resulting in delayed payments to the Debtor.  Some of the insurance companies have indicated it could take up to six (6) weeks for any changes in electronic deposit information to be implemented. Further, the existing Lockbox Account was established and is maintained to protect the interests of TCB in its collateral.

48.     The Debtor, therefore, requests Court approval to continue its existing Cash Management System as set forth in the motion seeking same. The existing Cash Management System is the most effective mechanism for managing receipts at this time.  The Debtor will ensure that any funds disbursed by the Debtor post-petition will be easily identified as post-petition expenditures and will come out of the DIP Account.

**AFFIDAVIT OF MICHAEL MILLER**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 14**

4836-6125-9816.1

49.     To the extent necessary, the Debtor believes that any funds held in the TCB Accounts, in excess of the amounts insured by the Federal Deposit Insurance Corporation, are secure and that obtaining bonds to secure these funds, as required by Section 345(b) of the Bankruptcy Code, is unnecessary and detrimental to the Debtor's estates and creditors.  There is no question that the Debtor's cash located at TCB is protected, as TCB is a highly rated banking institution. Moreover, as the Debtor intends to regularly reconcile the deposits into the Lockbox Account and transfer any collection on post-petition receivables to the DIP Receipts Account at PlainsCapital Bank, the funds in the TCB Accounts will diminish over time throughout the pendency of this Case.  Thus, the Debtor believes that "cause" exists pursuant to Section 345(b) of the Bankruptcy Court to waive such requirement.  The Debtor believes that the benefit of waiving the Section 345(b) requirement far outweighs any harm to the estates.

50.     Based on the foregoing, the Debtor believes that maintenance of the existing Cash Management System as set forth herein is in the best interests of its estate and all parties in interest. Accordingly, the Debtor seeks authority to maintain and use its Cash Management System during its chapter 11 case.

C.     EMERGENCY MOTION OF DEBTOR (1) TO AUTHORIZE CERTAIN PROCEDURES TO MAINTAIN THE CONFIDENTIALITY OF PATIENT INFORMATION, (2) FOR AUTHORITY TO FILE UNDER SEAL SEPARATE MATRIX AND SCHEDULE F CONTAINING PATIENT INFORMATION, (3) TO GIVE NOTICE BY PUBLICATION TO NON-CREDITOR PATIENTS, AND (4) FOR RELIEF FROM REQUIRED FORM OF MAILING MATRIX WITH REGARD TO SEPARATE MATRIX

51.     Certain current and past patients of the Debtor may assert claims, generally refund claims, against the Debtor, and under the Bankruptcy Code and the applicable Bankruptcy Rules, the Debtor is required to list information about such patients as potential creditors, including their names and addresses, in the creditor matrix and in the Schedules and

**AFFIDAVIT OF MICHAEL MILLER**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 15**

4836-6125-9816.1

Statements. Listing any patient names or addresses in the matrix, Schedules, and Statement, or any notice or certificate of service, however, may violate the HIPAA Privacy Rule, unless an exception permitting such distribution is satisfied.

52.     An exception exists in the HIPAA Privacy Rule for disclosures made with valid authorization. Valid authorization for purposes of the HIPAA Privacy Rule includes information authorized to be released for law enforcement purposes, which is defined as releases required by law (including court orders, court-ordered warrants, and subpoenas) and administrative requests. See 45 C.F.R. § 164.512(f). To the extent that the Debtor distributes protected health information pursuant to an order of this Court, such distribution would not violate the HIPAA Privacy Rule.

53.     Likewise, the Texas Privacy Act provides that a "covered entity" must comply with HIPAA and the TMPRA. See TEX. HEALTH AND SAFETY CODE § 181.004. Section 181.001(2)(A) of the TMPRA provides that the term "covered entity" includes a health care facility or clinic. Section 181.151 of the TMRPA prohibits the "reidentification or attempt to reidentify an individual who is the subject of any protected health information without obtaining the individual's consent or authorization." The TMRPA permits disclosure pursuant to a court order. See TEX. HEALTH & SAFETY CODE § 181.154(c)(2).

54.     To comply with applicable privacy restrictions, the Debtor proposes to file the Supplemental Schedule F and a separate patient creditor matrix ("Patient Matrix") under seal. Because the privacy restrictions of HIPAA may still be imposed beyond final disposition of this case, the Debtor further requests that the Patient Matrix and Supplemental Schedule F be kept confidential indefinitely and not deemed unsealed 60 days after the final disposition of these cases.

**AFFIDAVIT OF MICHAEL MILLER
IN SUPPORT OF THE DEBTOR'S CHAPTER 11
PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 16**

4836-6125-9816.1

55.     The Debtor estimates that it has treated over twenty-four thousand (24,000) patients at the Hospital in the last three (3) years ("Patients").  The Patients will be given notice 1)in writing in the form of the Notice of Commencement of this Bankruptcy Case and Proof of Claim form, as well as a communication informing the Patients how to request further notice of future pleadings and access to the claims agent's website, as set forth on Exhibit "B;" and 2) via publication in the local newspaper, as set forth on Exhibit "C."   The proposed claims agent for this case will be Donlin, Recano & Company, Inc. The Debtor is requesting that no further notices and/or pleadings be required to be given to the Patients in this case unless any such Patient requests further notices and/or pleadings or such timely files a proof of claim.

56.     Accordingly, the Debtor requests that the Court establish the following procedures to balance the need to protect patient health information with the need to disclose information regarding this case to the public:

(a)     the Debtor shall omit any reference to current or former Patients from the publicly filed matrix of creditors and any certificate of service not filed under seal;

(b)     the Debtor shall make an unredacted copy of the Schedules and Statements available to (a) the Court and to the United States Trustee upon request; and (b) any other party-in-interest only after this Court has entered an order, after notice and a hearing, authorizing the Debtor to do so;

(c)     the Debtor shall maintain a list of all current or former Patients (the "Patient Matrix") that would appear on the matrix of creditors, and shall make the Patient Matrix, or any portion thereof, available to any party-in-interest only after this Court has entered an order, after notice and a hearing, authorizing the Debtor to do so;

(d)     when the Debtor serves any paper upon any person listed on the Patient Matrix, the Debtor shall note in the respective certificate of service that the parties served include persons listed on the Patient Matrix;

(e)     the Debtor shall file the Patient Matrix and any Supplemental Schedule F under seal;

**AFFIDAVIT OF MICHAEL MILLER**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 17**

4836-6125-9816.1

(f)     the Debtor may give notice to Patients in the form of 1) the Notice of Commencement of this Bankruptcy Case and Proof of Claim form, as well as a communication informing the Patients how to request further notice of future pleadings and access to the claims agent's website; and 2) via publication as set forth herein; and

(g)     the Debtor is relieved from submitting the lengthy Patient Matrix in the format required by the Local Rules.

57.     The requested relief is required to permit the Debtor to comply with the HIPAA Privacy Rule and the TMRPA. In particular, the TMRPA imposes civil penalties for violations. The Debtor believes that the procedures proposed herein permit it to comply with both HIPPA and TMRPA, as well as its disclosure requirements under the Bankruptcy Code and Bankruptcy Rules.

D.     EMERGENCY MOTION OF THE DEBTOR SEEKING INTERIM AND FINAL ORDERS (1) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING, (2) GRANTING LIENS AND SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS, (3) MODIFYING THE AUTOMATIC STAY, AND (4) SETTING AND PRESCRIBING FORM AND MANNER OF NOTICE FOR FINAL HEARING

58.     The Debtor seeks authority, on an interim basis, to obtain DIP financing from Sabra (the "Post-Petition Lender") and to provide adequate protection on the terms and conditions set forth in the referenced motion and the related proposed interim order. An immediate need exists for the Debtor to obtain post-petition financing in order to continue the operation of its business. Without the use of such funds, the Debtor's vendors will cease to provide goods and services to the Debtor on credit, and the Debtor will not be able to pay payroll expenses for employees providing services at the hospital and other direct operating expenses, and obtain goods and services needed to carry on its business. The ability of the Debtor to finance its operations and the availability to the Debtor of sufficient working capital and liquidity is vital to the confidence of the Debtor's employees, patients, and major suppliers,

**AFFIDAVIT OF MICHAEL MILLER**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 18**

4836-6125-9816.1

and to the preservation and maintenance of the going-concern value of the Debtor's estate. The Debtor's need for financing of the type requested and as afforded by the proposed interim order is immediate and critical. Entry of the proposed interim order will minimize disruption of the Debtor's hospital operations and business as a going concern, will preserve the assets of the Debtor's estate, and is in the best interests of the Debtor, its creditors, and its estate.

59.     The Post-Petition Lender has represented that it is willing to permit the Debtor to borrow funds only in the amounts, and on the conditions provided for, in the motion and in the proposed interim order. The Debtor believes that, under the circumstances the terms and conditions set forth in the motion and in the proposed interim order are fair and reasonable for obtaining DIP financing and granting adequate protection.

60.     Prior to the Petition Date, the Debtor sought out several other potential sources of financing. The Debtor is unable to obtain credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code or on any other terms. The Debtor engaged in good faith and arm's-length negotiations with the Post-Petition Lender.

61.     The DIP Agreement is necessary to maintain the value of the Debtor's assets, including going-concern value, and the ability to continue its business and hospital and healthcare operations and provide medical care to the Frisco and North Texas community. Without the proposed DIP Financing as negotiated, the Debtor's operations will come to a halt, making a disposition of the Debtor's assets exponentially less valuable and frustrating the Debtor's efforts in Chapter 11.

**E.**     DEBTOR'S EMERGENCY MOTION FOR AN ORDER AUTHORIZING (I) THE DEBTOR TO PAY PRE-PETITION WAGES AND BENEFITS OR ALTERNATIVELY, TO PAY OR HONOR PREPETITION OBLIGATIONS TO CERTAIN CRITICAL VENDORS AND (II) TO HONOR AND PAY CHECKS ISSUED TO PAY PRE-PETITION WAGES AND WITHHOLDINGS

62.    As described above, the Debtor's workforce includes a total of one hundred fifty-nine (159) non-insider Employees ("Employees"). These are, in large part, highly skilled medical professionals that are very difficult to replace.  In many instances, physicians have assembled their team of proven specialized medical professionals whose expertise has been verified, and with whom they are comfortable working with for particular types of procedures. The doctors are committed to the safety of their patients and if they do not feel that they have adequate support for a patient procedure, they will schedule that procedure at another facility. Furthermore, assuming that replacement professionals were available, that would require going through an agency, taking time and an estimated 40% increased expense to the Debtor for that professional's services. Therefore, it is clear that the continued and uninterrupted service of the Employees is essential to the Debtor's continuing business operations and its ability to reorganize.

63.    The Employees are not technically employed directly by the Debtor; rather, they are employed by Shared Services.  In addition, the benefits, such as healthcare, are provided through one contract held by the Management Company that covers the employees at all six of the hospitals in the Forest Park System. This was done to provide additional buying power by pooling the volume of employees under one administrative roof and also reducing overhead through economies of scale.  The Debtor is also responsible for its portion of Shared Services' staff wages ("Shared Services Staff").  Those expenses are split amongst the seven other Forest Park affiliates.

64.    The Debtor is responsible for funding payroll for the Employees and its portion of the Shared Services Staff every two (2) weeks.  The Debtor estimates its gross payroll responsibility for a two (2) week period to be approximately $408,000.00 based upon recent

*AFFIDAVIT OF MICHAEL MILLER*
*IN SUPPORT OF THE DEBTOR'S CHAPTER 11*
*PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 20*

4836-6125-9816.1

payroll cycles.   The Debtor's first post-petition payroll funding responsibility will arise on October 1, 2015 (the actual payroll date is October 2, 2015, but such funds must be transferred for payment on October 1, 2015) for the period September 13, 2015 through September 26, 2015.   Nine (9) days of that payroll responsibility will be based upon services that were provided pre-petition.  The Debtor estimates that its payroll expense for the September 13, 2015 through September 21, 2015 pay period will total approximately \$485,500[3] based upon recent payroll cycles.   The net wages for the Pre-Petition Period is \$190,000.00 (the "Pre-Petition Wages").

65.    Each Employee's or Shared Services Staff's pre-petition wages that the Debtor seeks is equal to or less than the priority wage allowance of \$12,750 as allowed by Section 507(a)(4) of the Bankruptcy Code.

66.    In addition, as of the Petition Date, the Debtor had obligations relating to Pre-Petition Wages for withholdings from Employees' paychecks on account of various federal, state and local income, FICA, Medicare and other taxes for remittance to the appropriate federal, state or local taxing authority (collectively "Withholdings").   Shared Services, through the ADP payroll system, withholds the necessary and proper amounts for various federal, state and local income taxes, FICA, Medicare and other taxes.  The Debtor estimates the Withholding for the period September 13, 2015 through September 21, 2015 is approximately \$69,500.00.

67.    In the ordinary course of its business, Shared Services maintains (and the Debtor is responsible for, via contract with Shared Services) medical insurance, dental insurance and vision coverage programs for the benefit of the Employees.  The Debtor pays the majority of the premiums for such coverage for Employees and the balance of the premiums are deducted from

---

[3] This total includes approximately \$160,000.00 in past due benefit costs.

**AFFIDAVIT OF MICHAEL MILLER
IN SUPPORT OF THE DEBTOR'S CHAPTER 11
PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 21**

the Employees' wages through a bi-weekly contribution. The Debtor offers the Employees a 100% coinsurance PPO medical plan and a Health Reimbursement Arrangement to help the Employees manage the deductible on the group plan.  The Debtor is also responsible for 401k policy contributions for the Employees, with the Debtor's "matching" contribution totaling up to 3% of the Employee's 401k contribution.  Such contributions by the Debtor are vested based upon a five (5) year vesting schedule (collectively, together with the insurance benefits, the "Benefits").   The Debtor estimates the Benefits owing pre-petition are approximately $223,000.00.[4]

68.    Furthermore, the Debtor is also responsible for providing certain of the Employees with cell phone reimbursement and general expense reimbursement for approved business expenses (the "Expenses").  The Debtor estimates that the Expenses for the period September 13, 2015 through September 21, 2015 is approximately $3,000.00.

69.    The Debtor seeks authority to pay all (a) Pre-petition Wages, (b) Withholdings, (c) Benefits, and (d) Expenses, totaling **$485,500.00**.

70.    Alternatively, the Debtor seeks entry of an order authorizing it to pay, in the reasonable exercise of its business judgment, pre-petition amounts owed to Shared Services for Pre-Petition Wages, Withholding, Benefits, and Expenses as a critical vendor because the Employees are essential to the Debtor's business operation.   Shared Services provides the Debtor with clinical and nonclinical staff.  Shared Services has informed the Debtor that it will not have any funds with which to pay the Employees their pre-petition wage and benefit amounts unless Debtor pays such funds to Shared Services. If the Employees are not paid, they

---

[4] This calculation includes $160,000.00 for approximately two (2) months of past due benefits payments and is therefore substantially larger than an average nine (9) day benefit expense for the Debtor.

**AFFIDAVIT OF MICHAEL MILLER
IN SUPPORT OF THE DEBTOR'S CHAPTER 11
PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 22**

4836-6125-9816.1

will leave and find other jobs.  Without the Employees, the Debtor's business operations would collapse.

71.    Concurrent herewith, the Debtor has filed a motion seeking approval to obtain secured post-petition financing (the "DIP Motion").  The DIP Motion proposes that all such post-petition financing will be used according to a limited budget.  The compensation and related employment expenses referenced herein are included within such budget.  Accordingly, upon the approval of the DIP Motion, the Debtor will have sufficient funds to pay the amounts sought by this Motion.

72.    In order to maintain the continuity of its business and to preserve the morale of its vital labor force, it is essential that the Debtor be permitted to pay to the Employees the compensation that has accrued but remains unpaid as set forth herein.   Any delay or disruption in providing employee compensation will destroy the Debtor's relationship with the Employees and irreparably impair workforce morale at the very time when the dedication, confidence and cooperation of these individuals is most critical.  The Debtor faces the risk that its operations may be severely impaired if authority is not granted for the Debtor to make the payments described above.

73.    In addition, bolstering the Employees' morale will assist the Debtor in maintaining a "business as usual" atmosphere and, in turn, facilitate the Debtor's efforts to emerge from chapter 11 without significant delay.

74.    Because the amounts represented by Pre-Petition Wages are needed to enable the Employees to meet their own personal obligations, absent the relief requested herein, they will suffer undue hardship and, in many instances, serious financial difficulties.   Moreover, without the

**AFFIDAVIT OF MICHAEL MILLER
IN SUPPORT OF THE DEBTOR'S CHAPTER 11
PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 23**

4836-6125-9816.1

requested relief, the stability of the Debtor would be undermined by the potential threat that otherwise loyal Employees would seek other employment.

75.     In addition, to avoid the serious disruption of the Debtor's reorganization efforts that could result from the nonpayment of any withholding taxes, the Debtor seeks authority to remit all Withholdings, including pre-petition Withholdings, collected on behalf of the Employees to the applicable taxing authorities. Many federal, state, and local taxing authorities impose personal liability on the people in control of entities responsible for collecting taxes from Employees to the extent any such taxes are collected but not remitted.  Accordingly, if these amounts remained unpaid, there is a risk that either Shared Services or the Debtor's officers and directors may be subject to lawsuits or even criminal prosecution on account of any such nonpayment during the pendency of this Chapter 11 case.  Such lawsuits or proceedings obviously would constitute a significant distraction for managers at a time when they should be focused on the Debtor's effort to (a) stabilize their post-petition business operations, and (b) develop and implement a successful reorganization strategy.

76.     Payment of the Employees' wage claims is vital to the Debtor's reorganization because (a) the services provided by the Employees are the only or most economical source from which the Debtor can procure such services, (b) failing to pay the Employees would likely result in the loss of obtaining these same services, and (c) losing these services would have an immediate and severe impact that would jeopardize the Debtor's operation and effort to reorganize.

77.     Payment of the Employee wage claims is crucial to effect a substantial enhancement of the estate, to preserve and protect the estate, and to preserve the Debtor's going-concern value. The obligations that the Debtor seeks to pay represent a small percentage of the

**AFFIDAVIT OF MICHAEL MILLER**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 24**

4836-6125-9816.1

Debtor's total pre-petition debts.  Honoring these obligations enables the Debtor to continue its business operation, while not paying the Employees' wage claims will severely disrupt the Debtor's business operation and challenge the very success of this reorganization.

78.     On the whole, paying the Employee wage claims is a benefit to the estate.  Failure to deal with the Employees would result in a loss of revenue and a corresponding loss of value of the business.  The Employees provide specialized services to the Debtor that are essential to the operation of the Debtor's business and without which Debtor will have no income.  Without the proceeds from the medical procedures, the Debtor's operations will cease and Debtor's successful reorganization will be impossible.  The risk of harm to the Debtor's estate, therefore, is profound and is greatly disproportionate to the size of the payment sought to be approved by the Debtor.

**IV.**
**CONCLUSION**

79.     The primary purpose of the filing of this Chapter 11 Case is to maintain quality patient care and to prevent deterioration and to protect the going-concern value of the business operated by the Debtor while the Debtor explores and implements the best strategy possible to maximize return to its creditors. In the interim, through the First-Day Motions described above, the Debtor seeks to minimize certain adverse affects that this Chapter 11 Case might otherwise have on its business, while honoring the spirit of the Chapter 11 process.

80.     In order to maintain quality patient care and to preserve the value of its business to the fullest extent possible, the Debtor's immediate objective is to maintain "business as usual" following the commencement of this Case by minimizing the adverse impact of the filing on the Debtor's assets and operations and their ability to care for patients. The Post-Petition Financing is necessary at this time in order to maximize the Debtor's

**AFFIDAVIT OF MICHAEL MILLER**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 25**

4836-6125-9816.1

opportunities and realize any value for unsecured creditors. All other options would eclipse

such value. For the reasons described herein and in the First-Day Motions, I believe that the

prospect for achieving these objectives for the benefit of creditors and other stakeholders will

be substantially enhanced if this Court grants the relief requested in each of the First-Day

Motions and respectfully request the Court to do so.

**AFFIDAVIT OF MICHAEL MILLER**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 26**

4836-6125-9816.1

I declare, pursuant to 26 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge, and belief.

Dated: September 22, 2015

_____
Michael Miller, Chief Restructuring Officer

STATE OF TEXAS

COUNTY OF DALLAS

The foregoing instrument was acknowledged before me on this 22nd day of September 2015 by Michael Miller, Chief Restructuring Officer of the Debtor.



_____
Notary Public, State of Texas

SANDRA L MEINERS
My Commission Expires
March 31, 2018

**AFFIDAVIT OF MICHAEL MILLER
IN SUPPORT OF THE DEBTOR'S CHAPTER 11
PETITION AND REQUESTS FOR FIRST-DAY RELIEF – PAGE 27**

4836-6125-9816.1