# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: § | | CHAPTER 11 |
| § | | |
| FOREST PARK MEDICAL CENTER § | | |
| AT FRISCO, LLC § | | CASE NO. 15-41684 - BTR |
| § | | |
| DEBTOR. § | | |
| § | | HEARING DATE & TIME: |
| § | | September 23, 2015 at 1:30 p.m. |
| § | | |

### DEBTOR'S EMERGENCY MOTION PURSUANT TO SECTIONS 105(a), 345(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO (I) CONTINUE TO LIMITED USE OF EXISTING CASH MANAGEMENT SYSTEM AND (II) MAINTAIN EXISTING BANK ACCOUNTS AND (III) WAIVING CERTAIN DEPOSIT GUIDELINES

TO THE HONORABLE CHIEF JUDGE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE:

Forest Park Medical Center at Frisco, LLC (the "Debtor"), debtor and debtor-in-possession, hereby moves on an emergency basis for entry of an order for authorizing the Debtor to (i) continue to use its existing cash management system for limited purposes, (ii) to maintain existing bank accounts, and (iii) waiving certain deposit guidelines for a limited time (the "Motion"). In support of this Motion, the Debtor submits the Affidavit of Michael S. Miller in Support of the Debtor's Chapter 11 Petition and Requests for First-Day Relief, (the "Miller Affidavit")[1], filed contemporaneously herewith. In further support of this Application, the Debtor respectfully states as follows:

---

[1] Any defined terms not otherwise defined herein shall be ascribed the meaning contained in the Miller Affidavit.

**DEBTOR'S EMERGENCY MOTION PURSUANT TO SECTIONS 105(a), 345(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO (I) CONTINUE TO USE EXISTING CASH MANAGEMENT SYSTEM AND (II) MAINTAIN EXISTING BANK ACCOUNTS AND (III) WAIVING CERTAIN DEPOSIT GUIDELINES – PAGE 1**

4828-7305-8088.1

# I.
# STATUS OF THE CASE AND JURISDICTION

1. On September 22, 2015 (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor has continued in the possession of its property and is operating and managing its business as debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2. No request for a trustee or examiner has been made and no creditors' committee has yet been appointed in this case. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (O). Venue of these proceedings and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief sought herein are Sections 105(a), 345(b), 363(c), and 364(a) of the Bankruptcy Code.

# II.
# BACKGROUND

**A.**    **General.**

4. The Debtor is a doctor-owned Texas limited liability company that owns and operates a 54-bed state-of-the-art medical facility, including 30 private rooms, 14 family suites, and 10 intensive care rooms (the "Hospital") in Frisco, Texas. The Hospital is a luxury medical facility located at 5500 Frisco Square Boulevard in Frisco, Texas, off of the Dallas North Tollway and Main Street. It is currently minimally staffed for an average daily census of 1-3 inpatients per day and up to 200 outpatients per month, but has a fully staffed maximum capacity of 54 inpatients per day and 1,000 outpatients per month. The Debtor's leased facility is

DEBTOR'S EMERGENCY MOTION PURSUANT TO SECTIONS 105(a), 345(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO (I) CONTINUE TO USE EXISTING CASH MANAGEMENT SYSTEM AND (II) MAINTAIN EXISTING BANK ACCOUNTS AND (III) WAIVING CERTAIN DEPOSIT GUIDELINES – PAGE 2

4828-7305-8088.1

comprised of over 136,759 useable square feet and is situated on approximately 4.7 acres. Approximately 159 employees work at the Hospital, including 100 full-time employees and 59 part-time employees.

5. The Debtor offers a range of surgical services, including, but not limited to, pediatric, bariatric, brain, orthopedic, pain management, plastics and reconstructive, spine, and neurosurgery. The Hospital's back office services and employees are contracted through FPMC Services, LLC ("Shared Services"). Shared Services manages all revenue for the Debtor, as well as six other affiliates and is owned in equal parts by those seven entities for which it performs these services.

B. **Pre-Petition Secured Lender.**

Pre-Petition Financing

6. On or about October 10, 2012, the Debtor entered into that certain *Loan and Security Agreement,* dated as of October 10, 2012, by and between the Debtor and Texas Capital Bank ("TCB"), as such may have been amended and/or supplemented from time to time (the "Line of Credit Agreement"). The Debtors currently owe approximately $2,500,000.00 under the Line of Credit Agreement, secured by essentially all of the Debtor's assets ("Line of Credit"). The Line of Credit matured on or about December 31, 2014, with an additional extension to March 31, 2015. Around the time of the December 31, 2014 maturity date, the Debtor learned that TCB would not be renewing the Debtor's Line of Credit nor providing further extensions of credit past its maturity.

7. In addition, the Debtor is also indebted to TCB under that certain *Master Equipment Lease* dated May 30, 2012 (the "Master Equipment Agreement") for certain of the

DEBTOR'S EMERGENCY MOTION PURSUANT TO SECTIONS 105(a), 345(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO (I) CONTINUE TO USE EXISTING CASH MANAGEMENT SYSTEM AND (II) MAINTAIN EXISTING BANK ACCOUNTS AND (III) WAIVING CERTAIN DEPOSIT GUIDELINES – PAGE 3

4828-7305-8088.1

Debtor's equipment. The remainder of the equipment is leased through various parties, including General Electric Capital Corporation, Karl Storz, Commerce Bank and Olympus Corporation. The Debtor's total indebtedness, as to TCB, as of the Petition Date is approximately $6,000,000.00 secured by the Debtor's assets.

8. Currently, based upon a trailing three (3) months ending in July 2015, the Debtor generates approximately $3,400,000.00 a month in revenue, and has operational expenses of approximately $4,300,000.00 a month (not including restructuring costs and debt service obligations). As such, the Debtor does not generate sufficient revenue to operate the Hospital and to service its debt unless the number of patients exceeds recent levels.

Landlord and DIP Financing

9. The Debtor leases the real property and fixtures in which the Hospital operates, from Sabra Texas Holdings, L.P. ("Sabra") pursuant to the terms of that certain *Lease Agreement* dated December 6, 2010, which was thereafter amended pursuant to that certain *First Amendment to Lease Agreement* dated as of October 22, 2013, (the "Lease") assigning the Lease from FPMC Frisco Realty Partners, LP to Sabra. The Lease is for an initial term of 20 years, accruing rent in the amount of $842,290.00 per month for the Hospital and the parking structure, to increase every calendar year over the term of the Lease by 3%.

10. TCB has refused to provide the Debtor with debtor-in-possession ("DIP") financing. However, Sabra has offered the Debtor DIP financing in the approximate amount of $18,500,000.00, available in draws and accruing interest at a 5% interest rate, payable monthly in arrears ("DIP Financing") pursuant to that certain Senior Secured Superpriority Debtor-In-Possession Loan and Security Agreement ("DIP Agreement"). The DIP Financing would

DEBTOR'S EMERGENCY MOTION PURSUANT TO SECTIONS 105(a), 345(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE
FOR AUTHORIZATION TO (I) CONTINUE TO USE EXISTING CASH MANAGEMENT SYSTEM AND (II) MAINTAIN
EXISTING BANK ACCOUNTS AND (III) WAIVING CERTAIN DEPOSIT GUIDELINES – PAGE 4

4828-7305-8088.1

mature upon the occurrence of certain events, including the conversion of this Case, dismissal of this Case, the sale of substantially all of the Debtor's assets, the revocation of the Debtor's license to operate or the expiration of thirty-five (35) days after the filing of a Petition if a final order approving the DIP Credit Facility has not been entered by the Bankruptcy Court.

11. Prior to the Petition Date, the Debtor anticipated that without continuing liquidity, the value of its assets would rapidly diminish and would more than likely require the Debtor to close down the Hospital and liquidate its assets.

C. **Reorganization Efforts.**

12. The Debtor's operations were developed based upon an "out-of-network" model. This model relied upon higher reimbursement rates as an out-of-network facility. However, prior to the Petition Date, the Debtor determined that it would be unable to sustain the level of revenue needed to operate by operating solely out of network. Consequently, it attempted to increase its revenues by entering into network contracts with various insurance providers. Although being "in network" with various insurance providers would result in discounted reimbursement rates, it was thought that being in network would increase the volume of procedures at the Hospital and thus increase revenues. However, the reduced rates that were contracted for with the insurance providers were too low for the Hospital to schedule enough procedures to reap any financial benefit from the contracts.

13. The Debtor engaged Juniper Advisory, LLC for assistance to pursue a sale of the Hospital to a purchaser in June 2014. Despite many possible purchasers performing due diligence and even one offer for purchase, (such offer included a purchase of the real estate

**DEBTOR'S EMERGENCY MOTION PURSUANT TO SECTIONS 105(a), 345(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO (I) CONTINUE TO USE EXISTING CASH MANAGEMENT SYSTEM AND (II) MAINTAIN EXISTING BANK ACCOUNTS AND (III) WAIVING CERTAIN DEPOSIT GUIDELINES – PAGE 5**

4828-7305-8088.1

owned by Sabra and Sabra was unwilling to sell the real estate at the proposed purchase price), the Debtor was unable to close a sale.

14. In addition to seeking a potential purchaser, the Debtor's Management Company, Vibrant Healthcare Frisco, LLC, ("Management Company") also sought and located a replacement revolving lender that would pay off the TCB Line of Credit and provide up to an additional $6.5 million in additional availability based upon the amount of the Debtor's accounts receivable. However, this demand note, bearing 15% interest, provided a decreasing amount of liquidity due to the Debtor's declining accounts receivable balance while the Debtor worked to resolve obstacles to closing such as intervening lawsuits, a delay in signing a new management contract, and Sabra's impending eviction of the Debtor from its leased space. Ultimately, this financing never closed.

15. Finally, to address the increasingly exigent financial and operational issues, the Debtor retained Deloitte CRG ("Deloitte") on September 11, 2015. Deloitte was retained to assist the Debtor to, among other things, create short-term budgets, negotiate appropriate waivers and forbearances, and assess the Debtor's available assets and options by which to improve the Debtor.

16. In Chapter 11, the Debtor has an opportunity to quickly evaluate whether a plan of reorganization or a sale of the Debtor's assets will provide for the most recovery to the Debtor's creditors. This would avoid further deterioration of the Debtor's business, would preserve over one hundred jobs, and would achieve maximum values for all creditors. In order to evaluate the strategies set forth herein, and maximize values for all creditors, including unsecured creditors, the Debtor was forced to commence this Chapter 11 Case.

**DEBTOR'S EMERGENCY MOTION PURSUANT TO SECTIONS 105(a), 345(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO (I) CONTINUE TO USE EXISTING CASH MANAGEMENT SYSTEM AND (II) MAINTAIN EXISTING BANK ACCOUNTS AND (III) WAIVING CERTAIN DEPOSIT GUIDELINES – PAGE 6**

4828-7305-8088.1

## III.
## RELIEF REQUESTED

17. To efficiently and seamlessly manage its business, Shared Services, on behalf of the Debtor, utilizes a cash management system (the "Cash Management System") to collect and transfer the funds generated from the collection of the accounts receivable of the Debtor at the Hospital, depositing the collections in one bank account and transferring funds to a disbursing account from which its financial obligations are paid. The Cash Management System facilitates the Debtor's cash monitoring, forecasting and reporting, and enables the Debtor, through Shared Services, to maintain control over the administration of its bank accounts. A list of the Debtor's TCB Accounts (hereafter defined) is attached hereto as Exhibit "A."[2]

18. By this Motion, the Debtor requests authority to (i) continue to operate the Cash Management System to a limited extent, (ii) maintain certain of the Debtor's existing bank accounts and (iii) a waiver of Section 345(b) of the Bankruptcy Code as necessary.

## IV.
## THE CASH MANAGEMENT SYSTEM

19. Pre-petition, the Debtor's receipts, including but not limited to electronic funds transfers from insurance companies, credit card companies and direct patient payments, were deposited into one lockbox account at TCB in the Debtor's name (the "Lockbox Account"), and then swept to a disbursement account also at TCB from where all operating expenses, save payroll expenses, were paid (the "Disbursement Account"). Payroll expenses were transferred from the disbursement account to a separate payroll account held at TCB (the "Payroll Account") (together with the Lockbox Account and the Disbursement Account, the "TCB Accounts") and then transferred to ADP for processing. On or about Friday, September 11, 2015, TCB froze the

---

[2] Complete account numbers have been redacted leaving only the last four digits due to confidentiality concerns.

**DEBTOR'S EMERGENCY MOTION PURSUANT TO SECTIONS 105(a), 345(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO (I) CONTINUE TO USE EXISTING CASH MANAGEMENT SYSTEM AND (II) MAINTAIN EXISTING BANK ACCOUNTS AND (III) WAIVING CERTAIN DEPOSIT GUIDELINES – PAGE 7**

4828-7305-8088.1

TCB Accounts and is requiring the Debtor to seek permission for any expenses to be paid from the TCB Accounts. TCB has allowed the Debtor to continue to make critical payments by sweeping funds into the Disbursement Account.

20. The Debtor's cash management system is described further as follows:

A. The Debtor maintains the Lockbox Account at TCB (Account ******3152), into which all collectables are directly deposited. Funds from the Lockbox are transferred to the Disbursement Account as necessary for operations and payroll expense.

B. The Debtor maintains the Disbursement Account at TCB (Account *******4028), which serves pre-petition as the Debtor's primary operating account. The Debtor's operational revenues are deposited into the Disbursement Account. Funds from the Disbursement Account are used as necessary to fund the Payroll Account.

C. The Debtor maintains a third account at TCB, the Payroll Account (Account *******6097), which serves as the Debtor's account holding funds necessary to meet bi-monthly payroll obligations. Funds from the Disbursement Account are transferred to the Payroll Account in advance of those payments being made to ensure that they are maintained in sufficient amounts to fully fund payroll obligations timely.

D. Account no. *******2467 at PlainsCapital Bank ("PlainsCapital") (the "Legal Fees Account") was used for the sole purpose of depositing funds from the Debtor's members in response to a specific capital call made to fund legal expenses. As of the Petition Date, the Legal Fees Account had a $0.00 balance and the Debtor intends to close the Legal Fees Account post-petition.

21. As a practical matter many of the Debtor's customers transfer their payments directly to the Lockbox Account, and being insurance companies, changing that information can be time consuming and difficult, resulting in delayed payments to the Debtor. Some of the insurance payors have indicated it could take up to six (6) weeks for any changes in electronic deposit information to be implemented. Further, the existing Lockbox Account was established and is maintained to protect the interests of TCB in its collateral.

**DEBTOR'S EMERGENCY MOTION PURSUANT TO SECTIONS 105(a), 345(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO (I) CONTINUE TO USE EXISTING CASH MANAGEMENT SYSTEM AND (II) MAINTAIN EXISTING BANK ACCOUNTS AND (III) WAIVING CERTAIN DEPOSIT GUIDELINES – PAGE 8**

4828-7305-8088.1

22. Per the DIP Agreement, the Debtor shall not use any of TCB's Cash Collateral. As adequate protection only to the extent of the post-Petition Date diminution in value of TCB's pre-Petition Date security interests, TCB shall be granted replacement liens on all of the Debtor's equipment acquired by Debtor after the Petition Date. The replacement liens contemplated in Section 5(c) of the DIP Agreement are entitled to the same validity, priority and extent of TCB's security interests in the Debtor's equipment owned prior to the Petition Date. For any and all accounts collected by the Debtor after the Petition Date and subject to a prior perfected and unavoidable pre-Petition Date lien held by TCB, such funds received for such accounts shall be held in a segregated account and used only to reduce the balance of the indebtedness due and owing to TCB under the TCB Loans (as that term is defined in the DIP Agreement). On the fourteenth (14th) day after the Petition Date, all collections shall be deposited into the Debtor's DIP operating account at PlainsCapital (the "DIP Operating Account"), and TCB, Lender and Debtor shall periodically reconcile collections.

23. In the event post-petition receivables, which are not TCB's collateral, are deposited in the Lockbox Account, the Debtor will transfer those funds from the Lockbox Account to the DIP Operating Account. The Debtor will make all post-petition ordinary course of business payments from a second debtor-in-possession account (the "DIP Disbursements Account"), except for payments to ADP for payroll obligations attributable to the employees needed to operate the Hospital, which will flow from a third debtor-in-possession account (the "DIP Payroll Account") (together with the DIP Operating Account and the DIP Disbursements Account, the "DIP Accounts").

**DEBTOR'S EMERGENCY MOTION PURSUANT TO SECTIONS 105(a), 345(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO (I) CONTINUE TO USE EXISTING CASH MANAGEMENT SYSTEM AND (II) MAINTAIN EXISTING BANK ACCOUNTS AND (III) WAIVING CERTAIN DEPOSIT GUIDELINES – PAGE 9**

4828-7305-8088.1

# V.
# ARGUMENT

A. **Continuing the Cash Management System as Set Forth Herein is in the Best Interests of the Debtor, Its Creditors, and All Parties in Interest.**

24. The Debtor seeks authorization to continue its Cash Management System through its existing Lockbox Account. In order to avoid disruption to the Debtor's business and to the flow of incoming cash, the Debtor proposes to maintain its existing Lockbox Account for collections on pre-petition accounts receivables and to also open new DIP accounts at PlainsCapital, an authorized depository institution for DIP financing funds and proceeds thereof.

25. The Debtor proposes that collections from pre-petition receivables should continue to flow into the Lockbox Account consistent with pre-petition practices to avoid any delay in receipt of payments due to confusion. In the event post-petition receivables are deposited in the Lockbox Account, the Debtor will transfer those funds from the Lockbox Account to the DIP Operating Account as set forth herein. Unless TCB otherwise agrees, no disbursements will come out of the Lockbox Account other than reconciliations of cash that is attributable to post-petition receivables (*i.e.* Sabra's collateral). The Debtor does not intend to use or seek the use of TCB's cash collateral. The Debtor will make all post-petition, ordinary course of business payments from the DIP Disbursements Account.

26. The Cash Management System constitutes an ordinary course and essential business practice providing significant benefits to the Debtor, including, among other things, the ability to ensure the maximum availability of funds when and where necessary and reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.

**DEBTOR'S EMERGENCY MOTION PURSUANT TO SECTIONS 105(a), 345(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO (I) CONTINUE TO USE EXISTING CASH MANAGEMENT SYSTEM AND (II) MAINTAIN EXISTING BANK ACCOUNTS AND (III) WAIVING CERTAIN DEPOSIT GUIDELINES – PAGE 10**

4828-7305-8088.1

27. As a practical matter many of the Debtor's customers transfer their payments directly to the Lockbox Accounts, and being insurance companies, changing that information can be time consuming and difficult, resulting in delayed payments to the Debtor. Further, the existing Lockbox Account was established and is maintained to protect the interests of TCB in its collateral.

28. The Debtor, therefore, requests Court approval to continue its existing Cash Management System as set forth herein. The Debtor will ensure that any funds disbursed by the Debtor post-petition will be easily identified as post-petition expenditures and will come out of the DIP Disbursements Account.

29. Based on the foregoing, the Debtor believes that maintenance of the existing Cash Management System as set forth herein is in the best interests of its estate and all parties in interest. Accordingly, the Debtor seeks authority to maintain and use its Cash Management System for this limited purpose during its Chapter 11 Case.

30. Section 363(c)(1) of the Bankruptcy Code authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(l). The purpose of Section 363(c)(1) of the Bankruptcy Code is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the court. *See, e.g., Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d. Cir. 1997); *In re Enron Corp.*, Case No. 01-16034, 2003 WL 1562202, at *15 (Bankr. S.D.N.Y. Mar. 21, 2003); *Chaney v. Official Comm. of Unsecured Creditors of Crystal Apparel, Inc. (In re Crystal Apparel, Inc.)*, 207 B.R. 406, 409 (S.D.N.Y. 1997). Included within the purview of Section 363(c) is a debtor's ability to

**DEBTOR'S EMERGENCY MOTION PURSUANT TO SECTIONS 105(a), 345(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO (I) CONTINUE TO USE EXISTING CASH MANAGEMENT SYSTEM AND (II) MAINTAIN EXISTING BANK ACCOUNTS AND (III) WAIVING CERTAIN DEPOSIT GUIDELINES – PAGE 11**

4828-7305-8088.1

continue the "routine transactions" necessitated by a debtor's cash management system. *Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996). Accordingly, the Debtor seeks authority under Section 363(c)(l) of the Bankruptcy Code to continue the collection, concentration, and disbursement of cash pursuant to the Cash Management System described above.

31. The Bankruptcy Code also provides a debtor in possession the freedom to obtain unsecured credit and incur unsecured debt in the ordinary course of business without notice and a hearing. 11 U.S.C. § 364(a). *In re Amdura Corp.*, 75 F.3d at 1453 (10th Cir. 1996); *LNC Investments, Inc. v. First Fidelity Bank*, 247 B.R. 38, 45 (S.D.N.Y. 2000); *Mulligan v. Sobiech*, 131 B.R. 917, 921 (S.D.N.Y. 1991). The Debtor, therefore, seeks authorization, to the extent necessary, to obtain unsecured credit or incur unsecured debt in the ordinary operation of its Cash Management System.

32. Furthermore, Section 345 of the Bankruptcy Code governs a debtor's deposit and investment of cash during a chapter 11 case and authorizes deposits or investments of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). For deposits or investments, that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," Section 345(b) requires the estate to obtain from the entity with which the money is deposited or invested a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, unless the Court for cause orders otherwise. 11 U.S.C. § 345(a). In the alternative, the estate may require the entity to deposit governmental securities pursuant to 31 U.S.C. § 9303. Section 9303

DEBTOR'S EMERGENCY MOTION PURSUANT TO SECTIONS 105(a), 345(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO (I) CONTINUE TO USE EXISTING CASH MANAGEMENT SYSTEM AND (II) MAINTAIN EXISTING BANK ACCOUNTS AND (III) WAIVING CERTAIN DEPOSIT GUIDELINES – PAGE 12

4828-7305-8088.1

provides that when a person is required by law to give a surety bond, that person, in lieu of a surety bond, may provide a governmental obligation.  31 U.S.C. §9303.

33. To the extent necessary, the Debtor believes that any funds held in the bank accounts, in excess of the amounts insured by the Federal Deposit Insurance Corporation, are secure and that obtaining bonds to secure these funds, as required by Section 345(b) of the Bankruptcy Code, is unnecessary and detrimental to the Debtor's estates and creditors.  There is no question that the Debtor's cash located at TCB is protected, as TCB is a well-rated banking institution.  Moreover, as set forth herein, the Debtor intends to regularly reconcile the deposits into the Lockbox Account and transfer any collection on post-petition receivables to the DIP Operating Account at PlainsCapital.  Accordingly, funds in the Accounts at TCB will diminish over time throughout the pendency of this Case.  Thus, the Debtor believes that "cause" exists pursuant to Section 345(b) of the Bankruptcy Court to waive such requirement.  The Debtor believes that the benefit of waiving the Section 345(b) requirement far outweighs any harm to the estate. *See generally, In re Service Merchandise Co., Inc.*, 240 B.R. 894 (Bankr. M.D. Tenn. 1999).

34. Lastly, the Court may exercise its equitable powers to grant the relief requested herein. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a). Continuing the Cash Management System without interruption is vital to the efficient and economic administration of this Chapter 11 Case. Therefore, it is within the Court's equitable power under Section 105(a) to approve the continued use of the Cash Management System.

**DEBTOR'S EMERGENCY MOTION PURSUANT TO SECTIONS 105(a), 345(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO (I) CONTINUE TO USE EXISTING CASH MANAGEMENT SYSTEM AND (II) MAINTAIN EXISTING BANK ACCOUNTS AND (III) WAIVING CERTAIN DEPOSIT GUIDELINES – PAGE 13**

4828-7305-8088.1

**B.      Limited Maintenance of the Debtor's Existing Bank Accounts Is Warranted.**

35.    The Office of the United States Trustee's "Operating Guidelines and Financial Reporting Requirements Required in All Cases Under Chapter 11" mandate the closure of the Debtors' pre-petition bank accounts, the opening of new accounts and the immediate printing of new checks with a "Debtors-in-Possession" designation on them. If the Debtor is required to strictly comply with these guidelines, its operations would be severely harmed by the disruption, confusion, delay and cost that would most certainly result from the closure of its existing bank accounts.

36.    The Debtor believes, therefore, that its transition to chapter 11 will be more orderly, with a minimum of harm to operations and minimum costs, if the TCB Accounts remain open following the Petition Date. By preserving business continuity and avoiding the disruption and delay to the Debtor's collection procedures that would necessarily result from closing the TCB Accounts, all parties in interest, including employees, vendors, and customers, will be best served. Accordingly, the Debtor respectfully requests authority to maintain the TCB Accounts for the limited purpose as set forth herein.

37.    Post-Petition, all operating disbursements made by the Debtor will be made from its DIP Disbursements Accounts. Unless otherwise ordered by this Court, no bank shall honor or pay any check issued on account of a pre-petition claim. TCB or PlainsCapital (collectively, the "Banks") may honor any checks issued on account of pre-petition claims where this Court has specifically authorized such checks to be honored. Furthermore, notwithstanding anything to the contrary in any other "First Day" order or other order of this Court, the Debtor requests the Banks be authorized to accept and honor all representations from the Debtor as to which checks should be honored or dishonored consistent with any order(s) of this Court, whether or not the

**DEBTOR'S EMERGENCY MOTION PURSUANT TO SECTIONS 105(a), 345(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO (I) CONTINUE TO USE EXISTING CASH MANAGEMENT SYSTEM AND (II) MAINTAIN EXISTING BANK ACCOUNTS AND (III) WAIVING CERTAIN DEPOSIT GUIDELINES – PAGE 14**

4828-7305-8088.1

checks are dated prior to, on, or subsequent to the Petition Date. The Banks shall not be liable to any party on account of following the Debtor's instructions or representations regarding which checks should be honored. The Banks shall also be permitted to accept and process chargebacks against the Accounts arising out of returned deposits into such accounts without regard to the date such return item was deposited.

38. Based on the foregoing, the Debtor submits that the relief requested is necessary and appropriate, is in the best interests of its estate and creditors, and should be granted in all respects.

## VI.
## NOTICE

39. Notice of this Application has been given by e-mail, facsimile, overnight delivery, and/or courier on the Master Service List including the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the Eastern District of Texas; (b) the Office of the Texas Attorney General; (c) the Office of the United States Attorney General; (d) Texas Department of State Health Services; (e) Texas Capital Bank; (f) Sabra Texas Holdings, L.P.; and (g) each of the Debtor's twenty (20) largest unsecured creditors. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtor respectfully requests that the Court enter an order granting the relief requested herein and granting the Debtor such other and further relief as the Court deems just and proper.

**DEBTOR'S EMERGENCY MOTION PURSUANT TO SECTIONS 105(a), 345(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO (I) CONTINUE TO USE EXISTING CASH MANAGEMENT SYSTEM AND (II) MAINTAIN EXISTING BANK ACCOUNTS AND (III) WAIVING CERTAIN DEPOSIT GUIDELINES – PAGE 15**

4828-7305-8088.1

Dated: September 22, 2015.

                                Respectfully submitted,

                                */s/ William L. Medford*
                                William L. Medford, Esq.
                                State Bar No. 00797060
                                Vickie L. Driver, Esq.
                                State Bar No. 24026886
                                Lewis Brisbois Bisgaard & Smith, LLP
                                2100 Ross Avenue, Suite 2000
                                Dallas, Texas 75201
                                Phone: (214) 722- 7100
                                Fax: (214) 722-7111
                                Email: william.medford@lewisbrisbois.com
                                Email: vickie.driver@lewisbrisbois.com

## **CERTIFICATE OF SERVICE**

     I hereby certify that a true and correct copy of the foregoing pleading was served upon the parties listed on the attached service list via e-mail, facsimile, overnight delivery, and/or courier on this 22nd day of September, 2015.

                                */s/ William L. Medford*
                                William L. Medford

**DEBTOR'S EMERGENCY MOTION PURSUANT TO SECTIONS 105(a), 345(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO (I) CONTINUE TO USE EXISTING CASH MANAGEMENT SYSTEM AND (II) MAINTAIN EXISTING BANK ACCOUNTS AND (III) WAIVING CERTAIN DEPOSIT GUIDELINES – PAGE 16**

4828-7305-8088.1